Paula WHITE–RUIZ, Plaintiff,

v.

THE CITY OF NEW YORK, Raymond
Kelly, Police Commissioner of the City
of New York, Captain Albert Girimonte,
Lieutenant John Kavanagh, Lieutenant
Charles Dunbar, Sergeant Thomas Kennedy, Sergeant James McDermott and
Sergeant Vincent Marra, Defendants.

No. 93CIV.7233(DLC)(MHD).

United States District Court,
S.D. New York.

Aug. 5, 1997.

Sharon Cerrelle Konits, Ronald Podolsky, Hauppauge, NY.

Patricia B. Miller, Katherine A. Burroughs, New York, NY.

### MEMORANDUM & ORDER

DOLINGER, United States Magistrate Judge.

Plaintiff Paula White–Ruiz has been a police officer in the New York Police Department for the past ten years. In October 1993 she filed this action under 42 U.S.C. § 1983, claiming that various officers and officials of the New York City Police Department have engaged in a course of harassment against her in retaliation for her having disclosed an instance of corrupt behavior by one of her fellow officers. Based on these allegations, she asserts that the defendants, including the City of New York, should be held liable to her for violation of her First Amendment right to speak freely.

I have now conducted a bench trial of this case, extending over five and one-half trial days. Based on the evidence at trial, I find that, starting in 1988, plaintiff did in fact suffer from some forms of retaliation by unidentified police officers for having reported to appropriate Police Department officials a corrupt act by a fellow officer in 1988. I also conclude that the City of New York, through the actions or inactions of senior Police Department officials, bears legal responsibility for the proven misconduct of plaintiff's fellow officers. In addition, I find that the retaliation in question and the Police Department's manifested indifference to the plaintiff's vulnerability caused her injury in the form of emotional distress.

The foregoing findings do not, by themselves, suffice to establish the liability of any of the defendants. Defendants have belatedly invoked a statute-of-limitations defense to limit the scope of plaintiff's viable claims for discrete acts of retaliation. For reasons to be noted, however, I conclude that plaintiff's claims are not time-barred.

As noted, plaintiff seeks damages from various police officials and from the City. I conclude that plaintiff has failed to demonstrate that most of the named individual defendants participated in, encouraged or were otherwise responsible for the proven acts of retaliation. She has shown, however, that two of these defendants bear some legal responsibility for a portion of the proven misconduct. Moreover, she has established that the violation of her First Amendment rights is attributable to a practice or custom endorsed or acquiesced in by the responsible policymakers for the Police Department, and that the City is therefore liable for the proven violations of her constitutional rights.

Given these limitations, I conclude that judgment should be entered in favor of plaintiff and against the City of New York in the amount of $90,000.00, and that defendants Sergeant James McDermott and Inspector Albert Girimonte should be held jointly and severally liable with the City in the amounts of $5,000.00 and $10,000.00, respectively, each representing a portion of the damages assessed against the City. I further hold that judgment should be entered for the other defendants dismissing the complaint.

### A. The Facts

Plaintiff began her service with the New York City Police Department in January

1987, when she entered the Police Academy. She matriculated in the Academy for six months and was then assigned to Neighborhood Stabilization Unit ("NSU") Squad 14 in north Brooklyn.

During orientation by the Department's Internal Affairs Division ("IAD") when plaintiff was starting her tour with the NSU, she was instructed that she should report instances of misconduct by her fellow officers. The IAD instructors also informed plaintiff and the other new recruits that if they reported corruption by other officers, their communications would be treated confidentially.

On January 28, 1988, plaintiff was assigned to work with an Officer John Ward in the 66th Precinct. During the course of their patrol that day, they were required to guard the body of a deceased man in an apartment. As a result of certain actions taken by Officer Ward at the time, plaintiff came to suspect that her patrol partner had appropriated some money that he had found in the pockets of the decedent, and she reported her observations to the supervising officer who later came to the scene. Her report led to one or more interrogations of Officer Ward, who was placed the same day on modified duty, presumably because of suspicion of wrongdoing. The Department subsequently dismissed Ward, apparently for the misconduct reported by plaintiff.

Within one day after the incident, an account of the event had been placed on the Department's internal teletype system. The report contained specific references to plaintiff, by name, and identified her as the source of information that had led to Officer Ward's changed status. This message was distributed or accessible to all precincts within the Department. That disclosure was inconsistent with the assurances of confidentiality that plaintiff had previously received from the IAD.

Plaintiff reports, credibly and without contradiction, that her fellow officers at the 66th Precinct almost immediately began to shun her, that someone slashed her automobile tires and that the Commanding Officer of the precinct, a Captain Scagnelli, later advised her that she should consider a transfer to another precinct. Explaining this advice, the Commander told plaintiff that he was being reassigned and thus could not protect her in the future from possible retaliation for her actions in reporting officer Ward. In view of the evident hostility of her fellow officers and the vandalism, plaintiff agreed to a transfer, and on February 4, 1988 she was reassigned to the 90th Precinct.

Plaintiff testified, again credibly and without contradiction, that upon her arrival at her new precinct, she encountered evidence of hostility to her from some of her fellow officers and superiors. Thus, on her first day at the precinct she found the words "Black Bitch" scrawled on her locker, and one or more officers told her that they had been aware of her impending arrival, apparently through a departmental grapevine that had identified her as a "rat", or informer. In addition, when she met with the then-assigned precinct commander, a Captain Courtney, he warned her that she should not report what he apparently viewed as minor misconduct, such as officers accepting free services from local retailers. The clear implication of his comment was that her prior history had led both rank-and-file officers and the higher brass in the precinct to view her with suspicion and some hostility.

Because plaintiff was pregnant, she soon was reassigned to the District Attorney's office so that she could perform limited duties. She remained there until October 1988, when she returned to the 90th Precinct.

According to plaintiff, from the time when she was reassigned to the 90th Precinct in October 1988 until the present, she has been subjected to an unrelenting campaign of harassment by fellow officers and supervisors, presumably in retaliation for her having disclosed Officer Ward's misconduct. She further complains that the Department has shut its institutional ears to her complaints of mistreatment and has indeed encouraged or at least plainly acquiesced in the very misconduct about which she has complained.

I address each of these allegations separately, finding that plaintiff has sustained a number of her charges, although some of her allegations are neither supported by evidence

nor inherently credible. In reaching these conclusions, I find no reason to believe that plaintiff has intentionally misstated the facts. To the extent that some of her assertions are not borne out by the record, I infer that, having unquestionably been exposed to a very lengthy and harsh campaign of threats, vandalism, non-cooperation and isolation by some of her fellow officers and disdain from her supervisors, plaintiff has been attuned to view other people's motives in the harshest possible light and to recall details from the relatively distant past in a particularly negative vein.

### 1. Experiences at the 66th Precinct

Plaintiff testified without contradiction that the disclosure of her role in the Officer Ward incident immediately triggered a wave of expressed hostility and harassment directed against her in the days after the incident. I credit her testimony that her fellow officers in the 66th Precinct were open in their expressions of anger and suspicion and that she suffered the vandalism of her automobile. Moreover, I further credit her unrebutted testimony that the precinct commander was sufficiently aware of the situation that he advised her by early February 1988 to transfer to another precinct in view of his own impending departure from the 66th Precinct.

\* \* \* \* \* \*

The balance of my findings concern plaintiff's experiences after her transfer in February 1988 to the 90th Precinct. I start by addressing discrete incidents to which plaintiff testified and then consider certain conditions alluded to by plaintiff that were of a more continuing and long-term nature.

### 2. Interference with Radio Communications and Radioed Name–Calling

Plaintiff asserts that on a number of occasions when she was on patrol, she attempted to communicate by radio with headquarters and was prevented from doing so by the deliberate interference of one or more fellow officers. Plaintiff explains that this was accomplished by the officers "keying down" on their own radios at the same time and on the same frequencies, thus frustrating her ability to communicate with the precinct.

Although plaintiff suggested at one point in her testimony that this had happened frequently, when examined in more detail she asserted that it had occurred once in early 1988, when she was still at the 66th Precinct, then twice during her patrol on the evening of December 19, 1988 and finally several times in 1989 and 1990. The corroborating evidence, in the form of a Department investigatory memorandum, refers, inter alia, to a series of incidents on December 19, 1988. The report, which was triggered by a complaint lodged by plaintiff, contains an excerpt from radio communications of that night, and it indicates that one or more officers apparently interfered repeatedly with plaintiff's transmissions that evening. (PX 65; see also PX 80).

Plaintiff offered no independent evidence of other incidents of this sort, and I find that her general allusion to the asserted repetition of this type of event is not credible. Certainly at that period she was prepared to press grievances within the Department, and if she had done so in these instances, I would expect to find some indication of a complaint. Plaintiff conceded that she had not brought any other such incident to the attention of the Department, and I infer that her reticence is attributable to the absence of such a triggering event. Further support for this conclusion is the lack of any specificity in plaintiff's testimony about such other asserted incidents, which is quite inconsistent with her demonstrated ability to recount instances of harassment in considerable detail.

In a related vein, plaintiff credibly testified that on one occasion, on November 5, 1988, she heard one officer call her a "rat" and a "cheese eater" on her car radio. (PX 80). Indeed, these remarks were recorded by a Department tape recording system and were transcribed as part of a Departmental investigation of this and other incidents reported by plaintiff. (PX 76). Plaintiff identified the responsible individual at trial as an Officer McGrory, who was assigned at the time to the 90th Precinct, although she did not name him as a defendant in this case.

This incident was confirmed by a Department investigation, although the investiga-

tors concluded that they could not identify the responsible officer. (PX 77). They also failed to advise plaintiff about the outcome of their investigation despite her repeated inquiries.

### 3. *Refusal to Provide Back–Up*

Plaintiff testified that on the same evening as the keying-down incidents in December 1988, she approached a vehicle in which several males were riding who appeared to be potentially dangerous. According to plaintiff, she requested assistance from fellow officers, but all of the officers reached by radio declined to come to her assistance, thus subjecting her to danger from the automobile occupants. Plaintiff reported that she was ultimately assisted by a Housing Authority patrolman, although no arrests eventuated from this encounter.

Apart from plaintiff's testimony about this incident, the only evidence concerning the pertinent details is a report of investigation which describes a series of interviews of some of the officers who were on patrol that evening and summarizes certain findings from a review of radio transmissions. (PX 80). From this congeries of evidence—including plaintiff's account—I am inclined to conclude that what occurred represented willful non-cooperation with plaintiff by some of her fellow officers, although it is not at all clear that the non-cooperation took the form of an outright refusal to come to her assistance.

It appears that one officer failed to come because he was assigned to a fuel spill. Whether anyone else was asked to come is not clear. Nonetheless, the report confirms that at one point plaintiff asked for a check of a vehicle identification number and that the officer with the computer used for this purpose falsely told her that he had found no match when in fact he never ran the number through his computer.[1] It is also clear that throughout several encounters that plaintiff had that evening with other vehicles, one or more officers repeatedly and deliberately interfered with her radio transmissions, with

the evident goal of disrupting her ability to perform her work on her patrol. (PX 80).

In short, there is no real question that on that occasion officers were intent on preventing her from carrying out her responsibilities, irrespective of whether this behavior endangered her safety or that of the public. I view this conduct as probably a reflection of a prevalent attitude within the precinct at the time that she was to be isolated and, in effect, punished for her conduct with regard to Officer Ward, even if this approach endangered her physical safety. I also credit her unrebutted testimony that the Department investigators never disclosed the results of the investigation to her, and that this incident and the unresponsiveness of the investigators triggered considerable distress on her part because she felt both isolated and extremely vulnerable when patrolling high-crime neighborhoods without any assurance that her fellow officers would come to her assistance in time of need.

Notwithstanding this conclusion, I note that plaintiff cites no other comparable incident. That being the case, I infer that this particular source of insecurity diminished over time.

### 4. *Anonymous Letter*

Plaintiff reports that sometime in June 1989 she received in the mail at her home an envelope containing a copy of a Police Department memorandum announcing the discharge of Officer Ward. This document was not accompanied by any other form of communication or any identification of the sender. Since each officer's home address was required to be kept confidential by the Department, plaintiff suggests that the sending of this letter reflected not only a desire to retaliate on the part of the sender—presumably a fellow officer—but also the cooperation of others at the precinct, who were willing to go so far as to breach security.

I view plaintiff's testimony on this matter as believable, particularly given the proffer of the document and envelope and plaintiff's

---

1. The investigative report recommended that the officer in question should face a command discipline for his misconduct. (PX 68). Defendants offered no evidence, however, to suggest that this recommendation had been followed by the Department.

prompt complaint to the Department. She reported the incident to the IAD, and the Department investigated but was unable to identify the responsible party. (PXs 69, 72–74, 80). It also never advised plaintiff of the outcome of the inquiry.

### 5. *Anonymous Calls At Home*

Plaintiff testified that during late 1988 she received a series of harassing telephone calls at home, and complained to the Department. She offered very little information as to what, if anything, was said during these calls or as to their frequency, and provided no specific basis for her assumption that fellow officers at the precinct were responsible. In any event, the Department provided her with a tape machine to record any such calls, and once she installed the tape recorder the calls stopped.

Given the paucity of detail offered by plaintiff, I am not prepared to assume that the calls were triggered by her reporting of Officer Ward. If plaintiff had described what occurred during the calls, whether comments by the caller or stony silence, I might be in a better position to make a judgment on the matter, but in the absence of obviously pertinent information, I deem this allegation to be unproven.

### 6. *The Dead Rat*

According to plaintiff, sometime in 1990 she discovered a dead rat lying on the street immediately adjacent to her car. She attributes this to unidentified fellow officers, although she did not lodge a complaint with her precinct. Given the specificity of her testimony and its similarity to practices observed by the so-called Mollen Commission in its subsequent report on patterns of harassment within the Department, (see PX 61—COMMITTEE TO INVESTIGATE ALLEGATIONS OF CORRUPTION AND THE ANTI–CORRUPTION PROCEDURES OF THE POLICE DEPARTMENT, COMMISSION REPORT: ANATOMY OF FAILURE: A PATH FOR SUCCESS, at 51–60 (July 7, 1994) ("Report")), I credit this account.

### 7. *Paint Scratches*

Plaintiff testified that on several occasions in 1991, she found new scratches on the body of her car. She speculated that these instances of vandalism were attributable to unidentified officers. Apart from general evidence of Department hostility to her, she relied on the assertion that the scratches on her car bore paint color similar to the blue paint that is used on Department vehicles.

It is not entirely clear whether plaintiff's car was parked on the street in each of these instances, although I so surmise. It is of course entirely possible for cars parked on a public thoroughfare in New York City to suffer damage, particularly paint scratches, from a host of causes entirely unrelated to hostility from local police officers. Nonetheless, given the persuasive evidence that plaintiff was viewed with considerable hostility by a number of officers in this time period and was the target of other forms of harassment, as well as the apparently repetitive nature of these incidents, I am inclined to view at least some of these incidents as probable marks of retaliation by unidentified officers.

### 8. *Disparagement to Plaintiff's Husband*

Plaintiff also testified that some time in 1988 an unidentified Department employee telephoned her husband and accused her of having an affair with another officer in the precinct. According to plaintiff, this communication was both false and designed to destroy her marriage. She and her husband later separated, and she attributes the failure of her marriage, at least in part, to the stress caused not only by her mistreatment and resultant depression, but also by this false rumor.

Plaintiff has no direct knowledge of any such effort to incite her husband, much less the source of such a communication, if indeed one was ever received. I view this allegation as simply unproven.

### 9. *Being Followed*

Plaintiff offered testimony by a fellow officer, Sandra Craigg, that on two or three occasions in 1994, while riding with plaintiff in plaintiff's private car, she suspected that

they were being followed by another vehicle, and she suggested that this was the work of fellow officers seeking to intimidate plaintiff. officer Craigg admitted that she did not specifically recognize either the other car or its occupant or occupants, and in the absence of any such supporting evidence, I view this allegation as unproven.

### 10. Daily Assignments

Plaintiff spent considerable time at trial seeking to demonstrate that she had been subjected to a pattern of discriminatory assignments, purportedly in retaliation for having disclosed Officer Ward's misconduct to her superiors in 1988. Unlike many of the incidents to which I have alluded, this misconduct allegedly continued until 1994 or later.

The asserted unfairness is said to have taken two forms. First, her superiors frequently assigned her to tasks that gave her little or no chance to advance through the ranks of the Department, principally because they denied her the opportunity to make arrests, which is apparently a hallmark of achievement within the Department. These undesirable assignments, in which she was often assigned to work with a fellow outcast, Officer Hector Ariza, included such tasks as monitoring the precinct telephone or parking lot, accompanying senior officers in their squad cars, guarding violent prisoners committed to a local psychiatric ward, and other so-called fixed-post duties, including strike duty.[2]

Second, plaintiff complained about the alleged frequency of her assignment to unpleasant or dangerous tasks. These included guarding violent prisoners, watching over corpses, and patrolling union picket lines. The strike assignments, apart from their assertedly boring nature, were allegedly made still more unpleasant by virtue of the rule that, when on this form of patrol, she was not permitted to sit in a police van even if one was on the scene. Plaintiff complained that she and Officer Ariza were held to this regime even though other officers were permitted to ignore that restriction, a particularly onerous form of discrimination in the winter months.

I credit plaintiff's uncontradicted assertion that she and officer Ariza were treated differently from other officers while on strike duty, and specifically that they were exposed to the elements in winter while other officers were permitted, apparently improperly, to warm themselves in a police van. Plaintiff's more serious assertion, however, that she suffered from discriminatory assignments, is simply unproven. At the very least I would expect some concrete demonstration of the comparative frequency of her assignment and that of other officers to less favored posts, particularly since the precinct maintains records of all such assignments. Plaintiff failed, however, to proffer such evidence at trial, and offered no viable explanation for this failing.

I note that there are two sets of records of assignments of each officer, one reflecting initial assignments and the other recording changes of assignment during a tour. In addition, each officer is required to maintain a separate memo book in which he or she records all pertinent events of each patrol day, including assignments and changes of assignments, as well as absences and various forms of leave, whether for vacation or medical reasons. From this set of data plaintiff

---

2. Officer Ariza was apparently embroiled in continuing controversy within the precinct at the same time as plaintiff, although the reasons for this controversy are in serious dispute. Ariza, who filed his own suit in the Eastern District of New York in 1993, apparently believes that he was targeted for retaliation by the Department because he had testified before the New York City Council in 1990 that the Department was discriminating against Hispanic neighborhoods in its law enforcement policies. He claimed that as a result he was subjected to various forms of harassment, including undesirable post assignments and disciplinary charges.

We put relatively little stock in his specific complaints of retaliatory animus, although we infer from the evidence that Ariza was unpopular in the precinct. With regard to assignments, there was a lack of any meaningful evidence of a discriminatory pattern, and as for Ariza's disciplinary problems, it turned out that he had been the target of a lengthy array of civilian complaints of misconduct, including misuse of his firearm. Although he attempted to explain this pattern as a product of the precinct commander encouraging members of the public to file complaints against him, we view this assertion as both unproven and extremely implausible.

could have reconstructed the frequency with which each officer in the precinct received any form of assignment or change of assignment.

Plaintiff offered no such evidence. Rather she proffered simply a log of reassignments during a portion of the period from 1990 and 1991 (PXs 87–88), and her own testimony to the effect that she had received many unfavorable assignments. In response to questioning, plaintiff insisted that her assignments reflected a disproportionate number of undesirable posts, but she could not offer any specifics in that respect.

The most basic failing in this aspect of her case is the absence of data on the assignments of other officers in the precinct for any time period. Although plaintiff's counsel first indicated that he had been unable to obtain these records from the City by subpoena, when confronted with the representation by defendants' attorney that the City had never received such a request, he chose to forgo pressing the matter. I accordingly must infer that counsel never subpoenaed these records.

The records that plaintiff did proffer—those listing reassignments during a tour—suffer from two obvious defects. First, they do not reflect the relevant universe, which is all assignments of officers in the precinct, but rather indicate only those instances when an officer's assignment is changed during his or her tour. Second, plaintiff offered no analysis even of those fragmentary records to demonstrate the frequency of her reassignment to undesirable posts, as compared with the reassignment of other officers.[3] Moreover, a review of the documents simply does not disclose any discernible pattern in the reassignment of plaintiff to disfavored tasks, at least as' compared with other officers' reassignments.

As for plaintiff's own testimony about this matter, it was simply not reliable. First, plaintiff professed to have relied upon a review of her own memo books in characterizing the frequency of her assignment to such tasks as guarding a body or a psychotic prisoner, strike duty or other fixed post pa-

trol. Yet, when she was required, during her testimony, to review those memo books and calculate the number of times that she had actually been assigned to these tasks, she reported far fewer such assignments than suggested in her original testimony.

In a related vein, plaintiff complained about the denial of several requests by her for special "steady" assignments, which she viewed as desirable because they would accord better with her special scheduling needs as a single parent. In particular, she cited several unsuccessful requests for assignment to the so-called Community Policing Program ("C–POP"). She further testified that on several occasions when she had asked Lieutenant Marra to be considered for such an assignment, he told her that there were no openings, and yet she later learned that there had been an opening at the time and that it had been filled by another officer within days after her request.

Again, I am not persuaded that the denial of these requests was triggered, in whole or in part, by an intention to retaliate against her. As a general matter, a plaintiff seeking to demonstrate discrimination (or retaliation) in promotions or assignments must establish at a minimum that she applied for an open position, that she was qualified for the position, that she was not given the assignment and that this denial occurred in circumstances suggesting that the refusal was motivated by a discriminatory animus. *See, e.g., Fisher v. Vassar College*, 114 F.3d 1332, 1335 (2d Cir.1997)(en banc). Moreover, even if she meets this initial burden, the defendants may proffer a non-discriminatory reason for denying her the position, and in that event the plaintiff must demonstrate that the proffered reason is pretextual and that the real reason was discriminatory or retaliatory in nature. *Id.*

I find that plaintiff has not demonstrated that she was qualified for the C–POP position at the time in question and, even if I were to assume otherwise, she has not demonstrated that the neutral explanation offered by defendants was pretextual. In this

---

**3.** As plaintiff conceded, there is nothing either unusual or *per se* inappropriate in an officer

having a change of post during his or her patrol day.

regard I note that Inspector Albert Giri-monte, the commander of the 90th Precinct beginning in November 1991, credibly testi-fied that the C–POP program involved an effort to promote a continuing supportive relationship between the patrol officer and a particular community, and that it therefore required consistency in the presence of the officer on the streets of the chosen communi-ty. Inspector Girimonte reported that he had denied several of plaintiff's requests for the C–POP assignment principally because of her excessive absenteeism. It is not disput-ed that plaintiff had been on various forms of leave for extended periods of time between 1988 and 1992 (PX 92), and that the assign-ment to C–POP required that the officer be available for patrol on a consistent basis. Since plaintiff was not able at the time to meet this basic and reasonable requirement of the job, Girimonte reported, she was not given the assignment. I find this testimony to be both believable and not meaningfully contradicted. It therefore points to the fact that the refusals to provide this assignment to plaintiff were not motivated by a retalia-tory animus.

The absence of a malign intent in this regard is also underscored by the fact that, when plaintiff was legitimately qualified for the assignment, she received it. By 1993 her attendance had substantially improved, and then-Commander Girimonte therefore as-signed her to the C–POP program in Febru-ary 1993, although she ultimately withdrew from it in August 1994.

### 11. *Promotions and Transfers*

Plaintiff also complained, albeit in very general terms, that she had been denied promotions or transfers because of her con-troversial status in the Department. The difficulty with her case on this point is the absence of any specifics. Plaintiff failed to establish which positions she applied for and whether she was qualified for them. Al-though she indicated a desire to be consid-ered for such specialized units as the K–9 Corps and the Highway and Mounted Units, I lack the most basic information as to when she applied, whether openings were avail-able, what qualifications were required,

whether plaintiff had those qualifications, who was selected in her place, and what credentials they had for the job.

The absence of such proof is by itself fatal to plaintiff's claim in this respect. Moreover, given what I know of the background here, including particularly plaintiff's absenteeism problems—a pattern that persisted over a number of years, including the period when she claims that she was denied such pro-motional opportunities—I am quite skeptical that she could demonstrate both that she was qualified and that her failure to obtain such assignments was attributable to a retaliatory animus.

In sum, I do not credit plaintiff's conten-tion that these events reflect a decision with-in the precinct not to promote her or honor her request for reassignment, or that such a decision was attributable to a retaliatory in-tent.

### 12. *Accommodations for Children*

Plaintiff also complains that on one or several occasions fellow officers were permit-ted to bring their children to the precinct whereas she was chastised for doing so. She also suggests that her supervisors took child care problems into account in making assign-ments. In contrast, she asserts, she was denied any help in this regard, and she at-tributes the difference in treatment to ani-mus for her prior history with Officer Ward.

There appear to be legitimate explanations for the concededly rare occasions when the precinct commander made an exception to the ordinary "no children" rule in the pre-cinct. In particular, Inspector Girimonte in-dicated that he would countenance such an occurrence in an emergency, such as when the child-care person was sick. As far as posting was concerned, he indicated that as-signments to key posts such as C–POP were not to be made on the basis of whether they would assist the officer in arranging for cov-erage for his or her children. Girimonte did cite one instance, however, of an officer who was in the midst of a potentially devastating custody dispute—including an apparently le-gitimate fear that the children might be kid-napped—and whose circumstances he did

take into account in adjusting his work schedule.

Plaintiff could fairly be viewed as not presenting equally compelling circumstances, and I am not prepared, based on my assessment of the testimony and demeanor of Inspector Girimonte, to infer that he was motivated by discriminatory or retaliatory animus in this respect. In reaching this conclusion, I need not endorse the wisdom of a commander's decisions; all that I need conclude is that he did not act for an improper purpose. I so find.

### 13. *Miscellaneous Incidents*

During the course of her testimony plaintiff alluded to a number of incidents that, although not part of a broad and consistent pattern, were cited as examples of hostile behavior that plaintiff attributes to continuing animus for her reporting of Officer Ward. I address each briefly.

First, according to plaintiff, on one occasion on a date she could not recall when she was assigned to guard an emotionally disturbed prisoner, she entered the room in which the prisoner was held, only to discover that the prisoner was not in restraints, as required by police procedures. To make matters worse, she said, the prisoner was a former professional boxer and thus presumably capable of inflicting considerable harm. She managed to obtain prompt assistance from the hospital staff and thus escaped injury, but attributes the incident to a malevolent intention by an unidentified officer or officers to expose her to physical harm.

Plaintiff did not indicate whether she had reported the incident, and I assume that if she did not, the defendants would be hardpressed to attempt to rebut the testimony. Nonetheless, there was no meaningful effort to challenge plaintiff's account, whether by cross-examination or by rebuttal evidence, and I credit her testimony in this respect. Moreover, although mistakes of this sort can be innocently made, the confluence of this unusual event and plaintiff's plainly controversial status in the precinct at the time suggests a link between the two.

Second, plaintiff suffered from a preexisting back injury, which apparently contributed to the frequency of her sick leaves. She reports that during a tour in June 1992 she was suffering pain and therefore decided to report to the Health Services Unit, a necessary prerequisite to absenting herself from duty. According to plaintiff, Inspector Girimonte directed that she undergo some form of medical screening at the same time to determine whether she was malingering.[4]

Plaintiff reported to the Health Services Office and was examined by a Dr. Guzman, who reportedly gave her a sheet of paper indicating that she should go on "limited duty" assignment. Plaintiff testified that when she showed this document to a Lieutenant O'Connor, who was apparently in charge of the Health Service Office, the lieutenant tore up the document and told her to wait for an orthopedic surgeon, indicating that she was not going to be placed on such a restricted assignment. Plaintiff reports that eventually she was cursorily examined by a Dr. Axelrod, purportedly an orthopedic surgeon, and he told her to go back to work without limitation.

In connection with this incident, plaintiff also complains that she was denied transportation between the precinct and the Health Services Office, even though her back condition caused her considerable discomfort when using public transportation. Ultimately, however, she arrived back at the precinct and apparently resumed her normal duties.

Although somewhat skeptical that events occurred in quite the manner suggested by plaintiff, I note that defendants called no witnesses to address this issue, and I am therefore left with plaintiff's uncontradicted account. On balance, I infer that plaintiff's supervisors were generally unsympathetic to her medical complaints and may have treated her with less solicitude in this regard than they did other, more popular officers. This differentiation may have several sources, including a certain lack of personal chemistry between plaintiff and others in the precinct. Nonetheless, I infer that this gulf was in all likelihood at least partially attributable to the

---

4. Girimonte did not contradict this account when he testified after plaintiff.

original and apparently widely held view among fellow officers that she was to be shunned as an informer on one of her fellow officers.

Third, plaintiff testified that her father died in March of 1989. She complains that the police officers called to the scene delayed assisting, and therefore may have contributed to his death. She also asserts that a phone call was made to the precinct to advise her of her father's demise and that whoever was in charge of the switchboard failed to pass on the message. By implication, plaintiff suggests that these two episodes may have had some connection to her status in the precinct.

Neither of these contentions is borne out by the record. (PX 80). Plaintiff was not present when her father died and is not competent to testify about events surrounding his death. Moreover, she never called any witness who could testify competently about the matter. As for the telephone message, the switchboard operator at the time was apparently Officer Beverly Walser, a friend of plaintiff and a witness for her at the trial. She did not indicate that she had received such a message, and there is no other evidence that a message had been received and deliberately withheld from plaintiff.

Fourth, in 1995 plaintiff was involved in a major confrontation with her then-patrol sergeant, Cary Brofsky, which led to the filing of serious charges against her. Plaintiff contends that this fairly recent episode is evidence of a continuing pattern of retaliatory conduct directed at her. I disagree.

It appears that on October 6, 1995, plaintiff appeared at the precinct for a 7:00 A.M. patrol and was accosted by Brofsky, who accused her of being late. Plaintiff disputed this accusation and insisted that she had been on time. The discussion apparently deteriorated quickly, with plaintiff using some harsh profanity directed at the sergeant and the sergeant quite possibly reciprocating, if he did not in fact start the verbal sparring. Although he ordered her to remain in the room, she stormed out and went to the locker room to compose herself. Ultimately, charges were filed against her for lateness, insubordination and failure to obey a command. After a command hearing on March 6 and 8, 1996, she was convicted of these charges, and was suspended without pay for thirty days, put on termination notice and placed on probation for one year. The net effect was that she was subject to termination if she did not satisfactorily complete her probation.

Plaintiff's contention as to the root cause of this incident is not borne out by the evidence. I assume for this discussion that she accurately described the events, since her testimony is unrebutted, but she herself concedes that she lost her temper, cursed the sergeant and refused to remain when ordered to do so. Moreover, even if I assume that the accusation of lateness may not have been justified, I see little reason to suspect that Brofsky, who presumably came to the precinct long after the Ward incident, was motivated by a desire to retaliate. In any event, plaintiff had the benefit of a subsequent hearing, and she offers no evidence to suggest that the hearing officer was either demonstrably biased or blind to whatever evidence was presented to him. Thus we cannot conclude that the outcome reflected an arbitrary exercise of retaliatory power by the Department.

In any event, I view such a blatant form of retaliation as most unlikely for several reasons. First, given the pendency of this lawsuit, it would have been sheer folly for the Department to engage in retaliation of this kind. Second, I note that in the many years that plaintiff had been assigned to the 90th Precinct, there is no indication of a pattern of using disciplinary charges or even negative evaluations as a means of punishing her for the Officer Ward incident. Third, as even plaintiff conceded and as was evident from her manner at trial, she is quite high-strung and, I believe, likely quickly to take offense and react accordingly. It appears from her description that a minor quarrel with Brofsky erupted into a major confrontation for reasons of personality and not because of an intention on the part of the defendants to harass her.

### 14. Plaintiff's Isolation

Plaintiff testified that she has suffered from a pariah status within the precinct for

many years. This complaint appears to encompass a variety of asserted difficulties, ranging from the failure, on at least one occasion, of a fellow officer to bring her coffee from a neighboring store when other officers received such service, to the asserted refusal of some officers to pair up with her for patrol purposes. It also involves periodic remarks from both line officers and occasionally a supervisor to the effect that plaintiff is to be shunned or viewed with suspicion because of her past history. She further alleges that on at least one occasion in January 1991, when she complained to her patrol supervisor, defendant Sergeant James McDermott, about the pattern of her assignments, he suggested that she had no right to complain since she was viewed as a "rat."[5]

Plaintiff's testimony in this regard was not contradicted on the record, and on the whole I view it as credible, at least in its general terms. This follows not merely from the plausibility and general credibility of plaintiff's account and from the absence of contradiction, but also from the consistency of her testimony with the pattern of behavior documented in the so-called Mollen Commission report on corruption within the Department (*see* PX 61 at 51–69), and from the Precinct Commander's handling of an incident involving graffiti on a wall in the precinct, a matter to which I turn in the succeeding section.

### 15. *The Graffiti*

Related to plaintiff's claim of having been deliberately isolated and shunned within the precinct, she cites the discovery of graffiti of uncertain origin in the male officers' bathroom at the precinct in 1994. The dating of this graffiti is unclear, and the command's response to it is disturbing. Moreover, it suggests that hostility to plaintiff was not

entirely abated within the precinct even as recently as three years ago.

In October 1993 Officer White–Ruiz filed this lawsuit and arranged for service, among others, on Inspector Girimonte. The complaint related the litany of plaintiff's alleged difficulties in the precinct and asserted that they were traceable to police hostility to her as a whistleblower. In November 1993, Officer Ariza commenced a similar action and also arranged for service of his complaint on Inspector Girimonte. The complaint by Officer Ariza, unlike plaintiff's, specifically alluded to the presence of graffiti on the walls of the men's room at the 90th Precinct labeling Officers White–Ruiz and Ariza as "rats" and using other, still more uncomplimentary terms about both officers and the Civilian Complaint Review Board.[6] (PX 16 at ¶ 18).

Upon receipt of plaintiff's complaint, Inspector Girimonte took no action to assess the validity of her allegations. Moreover, when he reviewed Ariza's complaint, he did not even bother to verify the existence of the alleged graffiti. Although he testified that he had requested an aide to check on the matter in November 1993, he admitted at trial that he had never heard back and had never followed up.

The only effort to deal with the graffiti occurred in April 1994, when a police officer, Stephen Marino, reported to the precinct's Integrity Control Officer, Lieutenant Thomas O'Neill, that he had observed Officer Ariza in the men's room with a camera, apparently taking photographs, and that he suspected that Ariza may have been responsible for writing some of the graffiti on the same day. At that point O'Neill requested the assistance of the Crime Scene Unit, which arrived on the scene to take photographs. This was the prelude to an extended investigation by the FIAU, apparently for the limited purpose

---

**5.** Officer Ariza offered some corroboration for this testimony when he recounted an incident in which Sergeant McDermott referred to White–Ruiz as an "IAD rat" and suggested that she and Ariza were both "fuck-ups". Sergeant McDermott did not testify and thus of course did not seek to dispute this testimony.

**6.** As portrayed in photographs taken six months later by the Department's Crime Scene Unit, the graffiti included comments such as "This place is

filled with rats: Ariza, White–Ruiz, Church [a Sergeant at the 90th Precinct]", "W.O. [watch out] FOR P.O. ARIZA (tried to lock up a cop & a Sgt in the 60th pct)", "Ariza Sucks White–Ruiz Cock!", "Lets face it. Ariza is testifying in favor of a known felon. His testimony is against two of our fellow officers. You figure it out." and "C.C.R.B. [Civilian Complaint Review Board] FORMS" with an arrow pointing towards a toilet. (PXs 19, 17, 20, 18, 25 & 26).

of determining whether Ariza was responsible for the graffiti. That investigation ended inconclusively, and the precinct commander then arranged for the elimination of the offending graffiti.

This sequence of events strongly suggests that the supervisors of the 90th Precinct were indifferent to the presence of such comments on the walls of the precinct. As Lieutenant O'Neill admitted, the writing of such offensive graffiti was considered misconduct, and warranted both an inquiry as to who was responsible and the elimination of the graffiti. Despite this acknowledgment and explicit notice of the existence of the graffiti to Inspector Girimonte since at least November 1993, nothing was done about it until it appeared that Officer Ariza might be documenting the graffiti either for public release or for use in his lawsuit, and at that point the only effort undertaken by O'Neill and the rest of the Command was to attempt to blame Ariza for it. (PXs 27, 29–30, 36–37). When that effort failed, no further steps were taken to assess responsibility, despite the evident availability of means at least to make a reasonable inquiry.[7]

This conduct bespeaks apparent indifference to the problem of retribution being visited on officers who did not adhere to the widely acknowledged code of silence. As documented by the Mollen Commission report, which I discuss below, and publicly admitted by defendant and former Police Commissioner Raymond Kelly, this code not only encouraged officers to refuse to report instances of misconduct by fellow officers, but actively sought to isolate and retaliate against officers who defied the expectation of silence.

The indifference of the precinct command to the presence of this graffiti presumably extends to the potential significance of such graffiti, evidencing not only disdain for the officers targeted by the written comments, but also more generally some hostility to the role and responsibilities of the IAD, which is charged with rooting out police corruption.

Of particular significance for plaintiff's case, the continued and evidently tolerated presence of such graffiti presumably served as a warning to rank-and-file officers to keep their distance from Officer White–Ruiz, and thus served the function of continuing whatever stigmatization may have arisen from the original brouhaha over her turning in a fellow officer.

### 16. *Unavailability of Department Remedies*

Apart from the actions allegedly taken to punish plaintiff for having spoken out, she complains about the asserted refusal of the Department and her superiors to do anything concrete to address the problem since 1988. Thus, when she complained to the appropriate authorities in 1988 about the interference with her radio and the failure of the other officers to come to her assistance, she asserts that Department officials conducted only a *pro forma* investigation, although they had the means to address the problem, and then never reported to her the results of their inquiry despite her repeated requests. Similarly, she alleged that when she reported her receipt at her home of the copy of the memorandum documenting Officer Ward's termination, the Department made almost no meaningful effort to determine the identity of the wrongdoer and then never told her of its efforts or the results obtained.

Furthermore, several years later she contacted the Department's Office of Equal Employment Opportunity ("OEEO") to report her complaints about her treatment in the precinct, and was allegedly rebuffed, on the asserted basis that such a complaint of retaliation for whistleblowing was not within the jurisdiction of the OEEO, and that she should complain to the very precinct command hierarchy that was allegedly sponsoring or tolerating this retaliatory conduct. She claims to have also brought the matter to the attention of several individuals at the IAD and reports that she never heard back from them, even though she mobilized a con-

---

**7.** We note as well that during the investigation, an inquiry was made to the Department's legal counsel, apparently to determine whether Officer Ariza could be prevented from publicly disclosing the existence of the graffiti. Not surprisingly, counsel advised that he could not be prohibited from making such disclosure. (PXs 34, 39).

cerned organization representing minority members of the Department to press the matter.

Finally, she reports that her last effort to obtain redress short of litigation involved her preparation of a letter addressed to the then-Commissioner Raymond Kelly in late 1992. In the letter she outlined some of the difficulties that she was encountering, and requested an interview. She reports that, although she personally delivered a copy of the letter to a "Sergeant Ferrie" at the Commissioner's Office in December 1992, she never received a response.

Plaintiff's testimony as to her efforts to obtain redress are not meaningfully contradicted in the trial record. Although I view her complaints with regard to the adequacy of some of the investigations as perhaps exaggerated, the underlying pattern of futility strongly suggests the very low priority that the Department appears to have placed on protecting officers who reported misconduct—a state of affairs that I note is also echoed in the Mollen Commission report.

The FIAU investigation of the asserted interference with plaintiff's radio transmissions appears to have documented the occurrence of the event. Plaintiff complains that the investigators made little effort to identify who was responsible, and I am inclined to agree. I assume that if the investigators had given this matter higher priority, some concrete steps could have been taken to identify the officers involved. The current record discloses none. Although there is no guarantee that such efforts would have succeeded, even a failed effort would presumably have carried a message to the officers that such conduct was not tolerated.

I do not sit as a judicial overseer of the Department's handling of internal disciplinary matters. Nonetheless, I do view the lack of apparent effort in this respect as at least indicative that the Department gave this problem a low priority, a particular concern because the Department had reason to believe by that time that plaintiff was an actual or potential target for harassment as a result of her involvement in the Officer Ward affair.

As for the Department's investigation of the document anonymously mailed to plaintiff, she suggests that the investigators could have pursued precinct-wide fingerprint and handwriting analysis. The investigators concededly did not do so; rather, they asked plaintiff whom she principally suspected of involvement and then checked the handwriting of those few. Having gotten no matches, they apparently closed the inquiry and never informed plaintiff of the results.

Once more, I infer that this matter was not given a high priority. I assume that a more extensive effort might have yielded some results. Again, I recognize that the Department supervisors obviously have broad discretion as to how to allocate their resources. Nonetheless, given the plaintiff's prior history—including her role in disclosing Officer Ward's dereliction and the prior incidents of retaliation known to her superiors—and also the apparent breach of precinct security in releasing plaintiff's home address, I again infer a degree of deliberation in the Department's implicit decision as to how far to go in addressing plaintiff's complaint.

I also credit plaintiff's account of her effort to bring her problems to the attention of the OEEO. That being said, I do not view the response of the OEEO officer as improper or as reflecting any intention to downplay the potential significance of plaintiff's complaints. It is entirely understandable that the jurisdiction of that office would be limited to EEO issues and that plaintiff's whistleblowing complaints do not fit within that category.

I do view the record, however, as not providing a clear indication that plaintiff had an effective remedy that she failed to invoke. She testified to having made periodic complaints to some of her superiors about some of the alleged misconduct of fellow officers, but this appears not to have been a viable approach, as illustrated by the welcoming comments of Captain Courtney when she first came to the 90th Precinct and the subsequent remark of Sergeant McDermott about her being a "rat." Defendants have not suggested a credible alternative that she was plainly afforded and that she eschewed.

Finally, with regard to plaintiff's alleged effort to reach Commissioner Kelly, I note

that defendants proffered the testimony of Chief Lowell Stahl, who is currently serving in the Office of the Commissioner, to the effect that a file search of that office had not yielded the letter assertedly authored and delivered by plaintiff. I have no reason to doubt the *bona fides* of this representation. I equally have no reason to question plaintiff's testimony that she prepared and delivered a letter of complaint to that office and never received a response.

I do not infer, however, that the lack of a response is necessarily attributable to a refusal by Kelly to deal with such a matter. While it is possible that he did in fact personally receive the letter and did refuse or fail to act on it, I view as more plausible the inference that the letter was not actually received by the individual who was responsible for processing or otherwise dealing with such communications. Such a slip-up may have occurred either because plaintiff failed to give the letter to the correct person or because office procedures were not correctly followed, or both. Such failings are the more likely explanation since, even if the Commissioner were intent on ignoring such complaints, it seems likely that he would nonetheless have had in place a mechanism to acknowledge their receipt regardless of whether satisfaction was to be granted. In short, I do not read the Commissioner's silence as reflecting his knowledge of and intention to ignore plaintiff's complaint.

17. The *Asserted Preexisting Department Policy Encouraging or Acquiescing in Retaliation Against Whistleblowers*

Apart from the experiences that plaintiff personally recounted, she has offered several other pieces of evidence designed to demonstrate that, during the relevant time period, the Department pursued an unwritten policy or practice of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instances of police corruption. The principal source of evidence with regard to this matter is the final report, dated July 7, 1994, of the New York City Commission to Investigate Allegations of Police Corruption and the Anti–Corruption Procedures of the Police Department, the so-called Mollen Commission. (PX 61).

I have previously addressed the significance of that report in denying the summary judgment motion of the City. *White–Ruiz v. City of New York*, 1996 WL 603983, at *3–5 (S.D.N.Y. Oct.22, 1996). In the wake of the trial, I reiterate certain observations in the report, which I find to be entirely reliable.[8]

The Mollen Commission Report documents in detail a pattern of extensive police corruption, extending to many City precincts and lasting at least several decades. Accompanying that pattern, and essential to its maintenance, according to the Commission, was a so-called "code of silence", under which even honest officers were expected to protect corrupt colleagues from detection and punishment. In substance the Commission found that this culture "encourage[s] corruption" and "thwart[s] efforts to control corruption." (Report at 51).

In explaining the persistence of the code of silence, the Commission noted that it was stringently, if informally, enforced in the Department:

> Officers who report misconduct are ostracized and harassed; become targets of complaints and even physical threats; and are made to fear that they will be left alone on the streets in a time of crisis. This draconian enforcement of the code of silence fuels corruption because it makes corrupt cops feel protected and invulnerable.

(*Id.* at 53). Based on specific instances described in the Report, the Commission concluded that enforcement of the code of silence was pervasive, extending to virtually all precincts, and targeted both line officers and higher police officials. (*E.g.*, *id.* at 53–55). Moreover, the code was inculcated at the very start of the new officers' police careers, in the New York Police Academy, where the

---

**8.** At trial we received pertinent portions of the Mollen Commission report under Fed.R.Civ.P. 803(8)(C). *See, e g., Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 167 & 170, 109 S.Ct. 439, 448–49 & 450, 102 L.Ed.2d 445 (1988); *Gentile v. County of Suffolk*, 926 F.2d 142, 151–52 (2d Cir.1991); *Matter of Nautilus Motor Tanker Co.*, 862 F.Supp. 1251, 1253–57 (D.N.J.1994).

instructors warned recruits never to become a "rat" (*id.* at 55), and it extended even to the Department's Internal Affairs Division, which may disclose the identity of complainants to their colleagues. (*Id.*).

The Commission also addressed the responsibility of the Department itself for this state of affairs. Thus, it noted that the Department had neither acknowledged the existence of the code of silence nor taken any steps to end it. (*Id.* at 57). Most obviously, it had not ensured confidentiality to officers who reported instances of corrupt behavior by fellow officers. (*Id.* at 58). More generally, the Department's "management practices have often fueled an officer's susceptibility to corruption." (*Id.* at 60).

Of particular relevance, the Commission found that officers' widespread "cynicism about the Department's commitment to corruption control is justified." (*Id.* at 64). The justifications for this view ranged from disinclination by supervisors to enforce anti-corruption policies to outright protection or encouragement of such behavior and active thwarting of complaints. (*Id.* at 64).

The extent of the problem is underscored in Chapter Four of the Report, titled "The Collapse of the Department's Corruption Controls." (*Id.* at 70). In its discussion, the Commission documents that the system of oversight installed several decades before, in the wake of the report of the Knapp Commission, had completely collapsed years earlier, with only minimal efforts to trace corrupt activities. Of particular relevance to this case, the Commission emphasized that the anti-corruption effort had withered because top management in the Department not only had lost interest in it, but had conveyed the message, especially after one major scandal in 1986, that disclosure of corruption was undesirable and thus to be discouraged. (*Id.* at 71–73, 78).

As the Report notes, the enforcement of anti-corruption policies and procedures installed in the 1970s turned on the principle of command accountability, and that rule "depended solely on the Police Commissioner's dedication and adherence to that principle. If the Police Commissioner did not enforce a policy of holding commanders accountable when corruption was detected, no other person or unit within the Department accepted responsibility for carrying out that important function. Over time, enforcement of command accountability completely broke down." (*Id.* at 75).

In addition, the Department failed to exercise continuing supervision over the Internal Affairs Division. This failing was attributed to a lack of interest by the highest level managers of the Department and the "natural reluctance [of the Department] to uncover corruption." (*Id.* at 75). As the Report observes:

> [O]ne of the basic principles of command accountability—that diligence in uncovering corruption will be rewarded—had been completely perverted. In recent years, a message has filtered down from top commanders—including Police Commissioners—that disclosure of corruption, even that resulting from vigilant corruption fighting, would be viewed as a management failure.

(*Id.* at 78).

As a result, the Report notes, "[b]y the time the Commission commenced its inquiries in September 1992, only the skeleton of [the original oversight] system remained.... This state of affairs was allowed to continue because it appeared to protect the Department and satisfied its top commanders. No one in the Department had any incentive to fix what had broken, until their feet were held to the fire of public scrutiny." (*Id.* at 76. *Accord, id.* at 79). Other failings, including the absence of field supervision and the paralysis of the Internal Affairs Division, were also attributable to a determined lack of interest in corruption controls by top management, including Police Commissioners. (*Id.* at 82, 88, 90 (noting "Department's preference to bury rather than confront the problem of police corruption").)

As recounted by the Commission, this documented policy of ignoring police corruption and discouraging efforts to uproot it continued until after the Commission itself had begun to investigate the Department in mid 1993. Thus the Report notes the following:

[T]he Department completely abandoned its responsibility to transform [the police culture that tolerates corruption]. It made little effort to change the attitudes that foster corruption among the rank and file, supervisors or commanders; and it made little effort to convince anyone that *its* occasional pronouncements on integrity were more than obligatory rhetoric.

The Department also has done little to attempt to penetrate the wall of silence, although it is one of the major barriers to identifying and uncovering corruption. The Department never aggressively solicited information from its members. It did not reward courageous officers who came forward with valuable information; or penalize those who failed to report evidence of widespread or serious corruption about which they had personal knowledge. And it did nothing to try to educate its members as to why reporting and not tolerating corruption is essential to the Department and to them.

Indeed, we found that the first time the Department's top managers made an affirmative effort to solicit any information on corruption from its members was when this Commission attempted to do so ... [i]n July 1993....

*(Id.* at 107).

As noted, the Report of the Mollen Commission was premised on a series of investigations of patterns of conduct within the Department, and extensive hearings conducted by the Commission. Moreover, the testimony cited by the Report, including that of defendant and former Commissioner Raymond Kelly, is quite consistent with the factual findings contained in the Report. I also note that the findings of the Report are strikingly similar to the allegations of the plaintiff in this case, a set of allegations that were outlined in some detail in her initial pleading, which was prepared and filed more than one year before the issuance of the Mollen Commission Report, and in her Amended Complaint, which was filed months before the release of the Commission's Report.

Under all of the circumstances, I find the factual summary contained in the Report, insofar as it describes a deeply embedded culture dedicated to the concealment of corruption, to be entirely reliable. I also find credible the above-cited findings to the effect that the disinclination of the Department to root out corruption or to tolerate whistleblowers, much less to encourage them, was a custom or practice that pervaded the entire Department command hierarchy, from the Commissioner on down. Accordingly, I give the relevant portions of the Report—which defendants have conceded to be accurate—substantial weight in assessing plaintiff's assertion that her treatment was attributable to a policy or custom of the Department.

*ANALYSIS*

 In assessing the legal significance of the foregoing findings, I start with certain bedrock principles. To prevail against an individual defendant on a damages claim under section 1983, the plaintiff must demonstrate that her constitutional or other federal rights have been violated and that the named defendant is legally responsible for that violation by virtue of either his direct participation in the asserted wrongdoing or his authorization or toleration of such misconduct by his subordinates. To the extent that the plaintiff seeks to hold a municipality liable for such wrongdoing, she must establish that the violations were authorized or otherwise brought about as a result of a custom or practice of the municipality or of the relevant policy-makers of the municipality.

### A. Were Plaintiff's First Amendment Rights Violated?

 Plaintiff's legal theory is that defendants violated her First Amendment rights by retaliating against her for the exercise of those rights. To establish such a claim, the plaintiff must demonstrate that she has engaged in activity protected under the First Amendment, that she has suffered adverse action under color of state law and that the adverse action was causally related to her exercise of her First Amendment rights. *See, e.g, Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996); *Ezekwo v. New York City Health & Hosp.*

*Corp.,* 940 F.2d 775, 780–81 (2d Cir.), *cert. denied,* 502 U.S. 1013, 112 S.Ct. 657, 116 L.Ed.2d 749 (1991). *See generally Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697–98, 33 L.Ed.2d 570 (1972).

The central allegations pressed by plaintiff are that she reported to the appropriate Department authorities an act of dishonesty by a fellow officer, and that, in retaliation for that communication, she has since been disadvantaged in her conditions of employment and has otherwise been harassed both by line officers and by supervisors within the Department. She further alleges that this treatment of her resulted from an unwritten policy of the Department to turn a blind eye to police corruption and to encourage concealment of such wrongdoing. Plaintiff's allegations, if proven, would establish that she engaged in protected First Amendment activity, *see, e.g., Wise v. New York City Police Dep't,* 928 F.Supp. 355, 372 (S.D.N.Y.1996); *cf. Piesco v. City of New York, Dep't of Personnel,* 933 F.2d 1149, 1154–55 (2d Cir.), *cert. denied,* 502 U.S. 921, 112 S.Ct. 331, 116 L.Ed.2d 272 (1991) (City employee's testimony before legislative panel is protected First Amendment activity), and that she suffered retaliation as a result of that activity. If she further demonstrates that the misconduct was occasioned by a municipal policy or custom, she will have established the potential basis for claims not only against the individual wrongdoers for violation of her First Amendment rights, but against the City as well.

Our findings suffice to establish that plaintiff was exposed to a series of retaliatory acts in response to her exercise of her right to speak freely. Plaintiff recounted, credibly and without contradiction, that almost immediately after reporting Officer Ward, she was targeted by a Department-wide teletype, in plain violation of assurances of confidentiality from the IAD, and that this disclosure was followed, within a day or so, by overt expressions of hostility by her fellow officers in the 66th precinct, many of them expressly linked to her reporting Officer Ward's theft. Moreover, the commanding officer of that precinct explicitly acknowledged this state of affairs to plaintiff and urged her to transfer when he left the precinct.

The evidence also amply demonstrates that plaintiff's transfer to the 90th Precinct did not significantly alleviate this problem. Before her arrival, officers within the precinct knew of her impending appearance and her status as a whistleblower and promptly so informed her when she appeared at her new post. Moreover, the then-Commander of the precinct confirmed both that plaintiff's notoriety had preceded her and that it was not welcomed by the commanding officials of the precinct any more than it was by the line officers.

From the outset of plaintiff's tenure at the precinct, she was made to feel an outcast, shunned by many of her fellow officers and plainly not supported by her precinct commander. In microcosm, this series of events reproduces the pattern identified six years later by the Mollen Commission.

The stigma attached to plaintiff is reflected in a series of discrete actions taken by anonymous officers and a more consistent pattern of isolation seemingly imposed by a larger array of officers and supervisors. The discrete acts of juvenile, but potentially dangerous, harassment were largely confined to the early period, in 1988 and 1989, and included the interruption of plaintiff's radio communication on one occasion, the refusal to assist her in a potentially dangerous encounter,[9] the use of a police radio to bait her with the epithets "rat" and "cheese eater", several acts of minor vandalism to her precinct locker, vandalism to her car (matching the slashed tires suffered at her prior precinct), the anonymous mailing to her of the Ward memorandum, and the placement of a dead rat next to her car.

---

**9.** Defendants at trial sought to make the point that the encounter in question was not dangerous. Whether this is true or not, it is immaterial. The officer who received a call for information could not know that at the time, and his misleading failure to help was plainly not a result of an impartial assessment of the circumstances faced by plaintiff. Similarly, the officers who affirmatively interfered with plaintiff's communications that night were not doing so on the basis that her responsibilities that night were inconsequential.

More pervasive, and more consistently adhered to, has been an apparent pattern of stigmatization, or isolation, of the plaintiff from many of her fellow officers. As noted, this apparently began within a day or two after her reporting of Officer Ward, and appears to have continued, in one form or another, beyond the time when plaintiff commenced this action. The refusal of officers to work with the plaintiff as patrol partners began in 1988, and there is no indication that Department supervisors were interested at any time in correcting this situation. Indeed, the unrebutted evidence indicates that, as recently as 1991, one of plaintiff's own supervisors, Sergeant McDermott, referred to plaintiff as a "rat", an epithet that had also been directed at her by various officers as early as 1988, and that adorned the precinct wall—with the evident toleration of precinct supervisors—as recently as 1994.

The longevity of this pattern is striking. Although overt acts of misconduct directed at plaintiff apparently subsided after 1989, she continued, at least to a degree, to be marked as someone to be viewed with suspicion and held at arm's length. Since I assume some degree of turnover in precinct personnel during this time, it is not surprising that overt hostility would subside, but her continued notoriety and isolation must plainly be attributed to the original deliberate effort of some in the precinct to target her for retaliation and the manifest indifference of the precinct supervisors to her situation.

■ These findings dictate the conclusion that plaintiff's First Amendment rights have been violated, in the manner described, during a period commencing in early 1988 and continuing at least until the spring of 1994.[10] There remain for consideration the questions of which defendants are legally responsible

for these violations, the effect of defendants' proffered statute-of-limitations defense on plaintiff's ability to recover, and the extent of the damages for which she may be entitled to compensation.

### B. Assessing the Legal Responsibility of the Individual Defendants

■ In addressing the question of the individual defendants' responsibility for any constitutional violations, I note first that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir.1991)). All of the individual defendants named by plaintiff were supervisory officials in the Police Department. To demonstrate the requisite personal involvement of a supervisor, the plaintiff may show that:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [the plaintiff] by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995) (citing Wright, 21 F.3d at 501).

Plaintiff has named five individuals as defendants in this case.[11] Of these, four were

---

**10.** In reaching this conclusion, I note that a government employee's right to speak is not unconditional. In balancing the often-conflicting interests of government employees in exercising their right to speak and the government's interest in policing the conduct of its employees, the courts first look to whether the employee's speech was that of "a citizen on a matter of public concern", or was merely that of an employee complaining about his own personal situation. See, e.g., Saulpaugh v. Monroe Community Hosp., 4 F.3d 134, 143 (2d Cir.1993) (quoting Connick v. Myers, 461 U.S. 138, 147, 103 S.Ct.

1684, 1690, 75 L.Ed.2d 708 (1983)), cert. denied, 510 U.S. 1164, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1993). In this case, plaintiff's speech was plainly about a matter of public concern and not about a matter personal to her, since she was reporting a serious act of dishonesty by a fellow officer. See, e.g., Piesco, 933 F.2d at 1156–59; Wise, 928 F.Supp. at 371–72. Compare Saulpaugh, 4 F.3d at 143.

**11.** In addition to these five, plaintiff named two other individuals in her complaint, but both were

supervisors in the 90th Precinct at various times from 1989 until 1995. The fifth, former Commissioner Raymond Kelly, was in official charge of the Department beginning in October 1992, and was, as I have noted, the target of a complaining letter authored by plaintiff in December 1992.

Of these defendants, none can be saddled with responsibility for any of the more egregious individual incidents occurring in 1988 or 1989. Those were performed by unidentified officers, and there is no evidence that any of the individual defendants bore any responsibility for them.

Moreover, with two exceptions, the trial evidence does not demonstrate the responsibility of any of the named 90th Precinct supervisors for any other misconduct that may have occurred in violation of plaintiff's First Amendment rights. I address each separately.

Plaintiff names Lieutenant Vincent Marra because she blames him for her failure to receive certain desirable assignments. The uncontradicted evidence at trial, however, indicated that Lieutenant Marra played no role in determining who received those assignments. Since there is no evidence linking him to any other acts by police officers in derogation of plaintiff's rights, the complaint against him must be dismissed.

Sergeant Thomas Kennedy was at the precinct in 1989 and on one occasion wrote up plaintiff for a so-called command discipline. She apparently views him as having participated in precinct-wide efforts to retaliate against her for her purported status as a "rat". The evidence, however, is simply too thin to sustain the accusation that plaintiff seeks to rest on it.

Sergeant Kennedy was not plaintiff's supervisor, but on one occasion in 1989, as precinct desk officer, he wrote up a set of charges against plaintiff in a form known as a "command discipline". The charges in-

volved a failure to monitor the radio, a failure to respond promptly to a command and discourtesy. (PX 15). Ultimately, two of the charges were dropped and the discourtesy charge was upheld. The record contains no information suggesting that plaintiff ever appealed this finding, nor does it describe any adverse consequences that may have been visited on her as a result of this process.

Although plaintiff invites us to speculate that this one incident was engineered by then-Precinct Commander Courtney to harass her, I see no indication of this. Sergeant Kennedy credibly denied any involvement by Courtney in his decision to file the charges or even any inquiry by Courtney as to the outcome of the charges, and I have no information that any improper influence was brought to bear on the unidentified decision-maker who upheld one of the charges. On balance, I view this occurrence as, in all likelihood, an innocent outgrowth of some passing irritability between plaintiff and the Sergeant, and not a reflection of her tenuous status within the precinct. In this regard I note the absence of any evidence that disciplinary charges were repeatedly pressed against plaintiff [12], and I further note that she received generally favorable performance evaluations from her supervisors. (PXs 4–13).

Plaintiff also targets Sergeant James McDermott. For a period of time McDermott was plaintiff's patrol supervisor, and plaintiff alleges that he was responsible, at least in part, for an assertedly discriminatory pattern of changes in her patrol assignments. She suggests, as noted, that she was assigned or reassigned on a disproportionate basis to undesirable posts, and that this was done in disregard of her relative seniority in the precinct. She invites us to infer that Sergeant McDermott engineered these changes as a form of continuing retaliation against her. Moreover, in support of this conclusion she testified that on one occasion

---

dismissed from the case during the trial. Lieutenant Charles Dunbar was never served with the complaint, and is deceased. Similarly, the complaint was dismissed against Lieutenant John Kavanagh at the close of plaintiff's case, since no evidence had been adduced linking him to any wrongful conduct directed at plaintiff.

**12.** The only other incident reflected in the record was the previously described confrontation between plaintiff and Sergeant Brofsky, which took place approximately six years later.

she had spoken to Sergeant McDermott to voice her dissatisfaction with the frequent changes in her posts. According to plaintiff, when she made known her complaint, McDermott responded that she could not expect to be protected by her supervisors if she did not do the same for them and that she was known in the precinct to have been a "rat", an evident allusion to her having reported officer Ward.

It is striking that plaintiff's testimony about this conversation is unrebutted.[13] Indeed, Sergeant McDermott chose not to testify at all at trial. Under the circumstances I find plaintiff's account of this exchange to be credible.

The question remains as to what significance to assign to it. As noted, plaintiff has failed to demonstrate a pattern of discriminatory assignments or post changes, although the documentation needed to establish or refute this suggestion was available to her. Moreover, she has also failed to demonstrate that Sergeant McDermott was responsible for the post assignments or changes about which she complains.

Plaintiff appears to argue that even if she has not directly proven a discriminatory pattern in the post assignments, the very fact that McDermott responded to her complaint in the manner indicated is strong evidence that the assignments were retaliatory in nature and perhaps that he had a hand in them. I do not accept this conclusion.

The response by McDermott plainly betrays considerable hostility and even a willingness to engage in or tolerate retaliation of some sort against plaintiff. That, however, does not establish either that retaliation in the form suggested by plaintiff actually occurred or that McDermott was responsible for it. Given the fact that plaintiff could have offered direct proof of the alleged discrimination in assignments and did not do so, I am most reluctant to infer such discrimina-

tion from a comment by McDermott that may well have been triggered simply by his evident annoyance at her complaint and his apparent hostility to her for her prior act of honesty. Moreover, my reluctance to make the invited inferential leap is further supported by the demonstrated inaccuracy in plaintiff's testimony concerning the frequency of her assignment to undesirable posts. (*See* pp. 372–373, *supra* ).[14]

These failings preclude our holding McDermott responsible for constitutional violations that plaintiff has simply not proven. The question remains, however, whether he can be deemed legally responsible for some of the violations that plaintiff has established.

I have found that, throughout the plaintiff's tenure at the 90th Precinct, at least until April 1994, she was isolated to a degree, deliberately made to feel unwelcome and in this manner sanctioned for having reported Officer Ward. The principal significance of Sergeant McDermott's comments to plaintiff is that they strongly suggest that this pattern of treatment was not only known to some of her supervisors, McDermott included, but viewed by those supervisors as permissible or even appropriate.

██ As noted, liability for unconstitutional conduct may be imposed on supervisory personnel even if they have not directly participated in the misconduct, provided that plaintiff establishes that the supervisor "exhibited deliberate indifference to the rights of [the plaintiff] by failing to act on information indicating that unconstitutional acts were occurring" or that he "created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, [or was] grossly negligent in supervising subordinates who committed the wrongful acts,...." *Colon,* 58 F.3d at 873. In context, I view the testimony about Sergeant McDermott's comment as sufficient to establish his liability for at least

---

13. As noted, Officer Ariza offered some corroboration as to Sergeant McDermott's attitude toward plaintiff.

14. As noted, I do not assume any deliberate dishonesty by plaintiff in making these assertions. Indeed, I strongly suspect that she holds a firm belief that her pattern of assignments was

fundamentally unfair. Nonetheless, in making a factual determination that she has not carried her burden on this claim, I am persuaded that the shakiness of the factual premise for her accusation against Sergeant McDermott precludes finding him liable on this point.

some of the misconduct taking place in the precinct while he was acting as plaintiff's patrol supervisor.

Plaintiff established that even in the early 1990s fellow officers consistently refused to be paired with her, apparently as part of a general refusal to deal with an officer who was viewed as a "rat." Moreover, it appears that there may have been occasional verbal incidents and possibly petty vandalism, and occasional other minor efforts to discomfort her—such as the refusal to allow her and Officer Ariza to enter a police vehicle on strike post even though other officers were allowed to do so—throughout this period.

As I have already noted, the evidence suggests that this pattern of behavior was not unknown to at least some of the precinct supervisors, who appeared to manifest at least a studied indifference to the situation. Given this context, I infer that Sergeant McDermott was well aware of plaintiff's status in the precinct, and I find his comments to plaintiff to be confirmation both of his knowledge of the situation and of his acquiescence, if not outright approval. This attitude is, I note, consistent with the general findings of the Mollen Commission concerning the prevailing attitudes throughout the ranks of the Department during this period of time.

The only remaining question is whether McDermott's position gave him the authority to deal with such matters. If not, his view of them would presumably be of no legal consequence, whereas, if he had the authority to act, he could be found legally responsible by virtue of his failure to do so. *See, e.g., Colon,* 58 F.3d at 873. *See also United States v. City of Yonkers,* 96 F.3d 600, 612–14 (2d Cir.1996) (Equal Protection Clause violated by knowing failure of state officials to act); *Wise,* 928 F.Supp. at 364–65.

The record is sparse, to say the least, concerning McDermott's responsibilities, but I note that he served as patrol supervisor and, on occasion, as desk officer. Moreover, I infer from the testimony of other sergeants in this case that, by virtue of their rank, they have fairly broad supervisory responsibility

within the precinct for the conduct of patrol officers. On that basis, I conclude that Sergeant McDermott had the authority to act to prevent line officers from boycotting or otherwise retaliating against any police officer in the precinct, and that he chose not to do so in the case of plaintiff although aware of her pariah status. Such conduct reflects deliberate indifference to her rights, as well as gross negligence in supervising officers in the precinct, and thus renders McDermott legally responsible for such wrongful conduct as occurred during his period of supervisory responsibility.[15]

█ In addition I note that the very conversation reported by plaintiff reflects a further direct act of retaliation. As noted, plaintiff was complaining to McDermott about what she perceived as a discriminatory pattern of assignments or post changes, and was apparently seeking redress. As recounted by plaintiff, McDermott refused even to consider the matter or to review her allegations precisely because he viewed her as a "rat." The failure of a supervisor to consider an officer's complaint, whether merited or not, on the basis of the officer's prior exercise of her right to speak is itself a form of unconstitutional retaliation, and thus a separate basis for liability. *See, e.g., Sumner v. United States Postal Svc.,* 899 F.2d 203, 208 (2d Cir.1990); *Grant v. Hazelett Strip–Casting Corp.,* 880 F.2d 1564, 1569 (2d Cir.1989); *Henderson v. Center for Community Alternatives,* 911 F.Supp. 689, 701 (S.D.N.Y.1996).

The remaining individual defendant who had direct supervisory responsibility for the 90th Precinct is Albert Girimonte, who was commander from 1991 to 1995. I note that Girimonte was not at the precinct when the most blatant incidents of retaliation took place. Moreover, for reasons noted, I discount plaintiff's complaints about his conceded initial refusals to assign her to the so-called C–POP post in view of her very spotty attendance record. Inspector Girimonte explained in convincing detail the acute need for consistency of attendance by officers as-

---

**15.** We address below the question of the extent of McDermott's liability under this general ru-

bric.

signed to that function, and I fully credit his explanation. Moreover, I note that in 1993, when plaintiff had reduced her record of absenteeism, Girimonte did honor her request for this assignment.

For reasons already noted, I also do not view Girimonte's refusal to permit plaintiff to bring her children to the precinct or to use her patrol car to transport them as manifesting a malign intention. He was applying a sensible rule in an apparently neutral manner, and although he made a few exceptions, I view his explanation of those exceptions as believable.

In the absence of evidence of Girimonte's direct participation in any retaliation against plaintiff, she must rest her claim against him on the notion that he was aware of the mistreatment that she suffered and either approved or acquiesced in it, or that, even if not fully aware of what was happening to her, he was grossly negligent in his supervision of this aspect of precinct operations or else deliberately indifferent to her plight. I conclude that she has sustained her burden on this point.

It does not appear that plaintiff specifically complained to Girimonte about any matters other than her desire to obtain a C–POP assignment and her child care problems. Girimonte denies that she complained about retaliation *per se*, and I view his testimony on this point as credible. I interpret this relative quiescence by plaintiff as reflecting a degree of exhaustion in her multi-year efforts to obtain redress, and I further note that by late 1992 she was pursuing a remedy before the Commissioner.

Even indulging this assumption, however, I view the evidence as demonstrating a degree of willful blindness on the part of the precinct commander. Girimonte testified that when he assumed command, although he was new to the precinct, he did not consult his predecessor, a Captain Emanuel Neuwirth, about personnel issues of this sort in the precinct. Our impression is that Inspec-

tor Girimonte is both intelligent and seemingly a competent administrator. I therefore find his failure to explore such a key question with the outgoing commander as at least suggestive that he, like much of the Department command structure, attached little importance to addressing personnel conflicts that were based on individual officers' disclosures of corruption.

I further find Girimonte's profession of complete ignorance of the problem throughout most of his tenure as both implausible and refuted by the concrete evidence in the record. As noted, plaintiff's checkered status was well known in the precinct at the lower staff levels. Moreover, the attitude toward plaintiff that was apparently widespread in the precinct—from the commander down to the regular patrol officers—in 1988, had still not fully dissipated by November 1991, when Girimonte took over command. Indeed, the expression of views by Sergeant McDermott about plaintiff's pariah status also took place in 1991, shortly before Girimonte took command of the precinct. If such views were shared not only by some patrol officers, but by one or more supervisors as well, I expect that the Commander—even if occupied by other matters—would eventually acquire some awareness of the general situation.

Moreover, the record does contain direct evidence that Girimonte received specific notice of the problem, and that he failed to address the matter in any respect. As noted, plaintiff filed her lawsuit in October 1993 and served Girimonte that month. Plaintiff's fellow officer, Hector Ariza, filed a similar complaint in November 1993, and served the Inspector that month. The two complaints, which Girimonte read when served, contained sufficiently detailed allegations of the asserted pattern of retaliatory conduct in the precinct to alert the chief administrator of the precinct to the possibility that misconduct of the nature established here at trial was occurring under his command.[16] Girimonte,

---

16. We offer no comment about the merits of any of the allegations in Officer Ariza's complaint, which was filed in the Eastern District of New York. We cite it solely for the fact that it contained certain specific allegations about a pattern of retaliatory conduct in the precinct, and thus gave notice to the precinct commander of allegations of misconduct, some of which were presumably worthy of inquiry, and one of which—

however, apparently took no concrete steps at that time to determine whether the alleged problem existed; if so, its scope; and whether remedial measures were called for.

As noted, the most concrete evidence of the problem alluded to in the Ariza complaint was the allegation as to explicit and—by Sergeant O'Neill's testimony—sanctionable graffiti on the walls of the precinct's men's room. By his own testimony Girimonte conceded that he never even bothered to enter the lavatory to determine the truth or falsity of the allegation after he had received and read the Ariza complaint. Moreover, although he alluded vaguely to having requested an assistant to check on the matter— the one portion of his testimony that I find lacking in credibility—he concedes never hearing anything further of the matter and never inquiring himself. As I now know, the graffiti was indeed on the wall of the lavatory, and had been there for some time, and nothing was done about it until the discovery, six months later, that Officer Ariza was photographing it. Finally goaded into action, the precinct commander's only response was to attempt to blame Ariza for the graffiti, and, when that failed, finally to whitewash it.

This pattern of events reflects the continuation of a command philosophy in the precinct—previously expressed by Captain Courtney—that "rats" were unwelcome and that retaliation against them was at least tolerable. I infer that Inspector Girimonte had some awareness of the problem at some point after he assumed command and that he chose, at best, to avert his eyes, even when facing specific allegations of misconduct in the form of separate lawsuits by two officers under his command.

▪ Under the circumstances, I conclude that Inspector Girimonte is liable for the retaliatory conduct that continued while he was Commander of the precinct. The evidence demonstrates his general awareness of the prior custom in the precinct, and his failure to remedy it, as well as his notice of specific misconduct and his deliberate indifference to it.

the allegation of graffiti—was immediately verifi-

The remaining individual defendant is former Commissioner Kelly. Plaintiff's principal theory for holding Commissioner Kelly liable is apparently his failure to respond to her letter complaint, which she delivered to his office in December 1992. Alternatively, she may be heard to complain that he took no visible action after he was served with the complaint in this case in December 1993. Finally, she may perhaps intend to suggest that since the 1994 Report of the Mollen Commission identified a long-standing practice in the Department encouraging the concealment of corruption and the toleration of retaliatory action against those officers viewed as "rats", Kelly should be deemed a proponent of such a policy since he became Commissioner some time prior to the issuance of the Mollen Commission Report.

The first theory must be rejected. As noted, I have found that plaintiff failed to demonstrate that Kelly had actual notice of her difficulties. Since such knowledge is a *sine qua non* of liability under this theory, it cannot be sustained.

The second theory is equally unpersuasive. The fact that Kelly received the complaint in December 1993 does not allow us to infer that the failure of the Department to remedy plaintiff's grievances promptly is attributable to Kelly's having acquiesced in the misconduct or his having acted with deliberate indifference or gross negligence in his supervision of the Department. The scope of the Commissioner's responsibilities and the size of the Department undercut any assumption that, on receipt of a complaint by an individual police officer, the Commissioner can reasonably be expected rapidly to assess the nature of the problem, evaluate the *bona fides* of the allegations and bring about a prompt solution. I note in this regard the obvious fact that the Police Department is frequently sued, and that in our experience the Commissioner of the Department is often named as a defendant whether or not he had any involvement in the events underlying the allegations of the pleading. It is plainly implausible under these circumstances to infer that inaction, even for months, in the face of

able.

the commencement of a lawsuit of this nature is evidence of legal responsibility.

Indeed, the argument is even weaker when, as here, the notice given the Commissioner is in the form of a lawsuit. Unlike an internal grievance or complaint, which will presumably be handled administratively, it is likely that such a court-filed complaint will first be addressed by legal counsel, with due regard for the defendants' legal exposure. Once an officer's grievances are embodied in such a format, I would expect that an administrative response would come more slowly and would more likely reflect the attorneys' assessment of litigation considerations, and is thus less likely to embody the policies of the Commissioner.

Plaintiff's remaining apparent theory for holding Commissioner Kelly personally liable is based on his tenure as Commissioner during at least a portion of the period when she suffered retaliation and during part of the period when, according to the Mollen Commission Report, the Department pursued its long-time policy of discouraging reports of corruption. This theory is also unavailing.

First, I note that the record is silent as to when Commissioner Kelly assumed command of the Department. This alone represents a serious weakness in plaintiff's case, since I cannot, on the basis of the evidence, assess the plausibility of the notion that Kelly had sufficient time as the top policy-maker to choose, in effect, to adopt the preexisting policy or custom. This weakness is particularly acute in view of the fact that the Commissioner's undated testimony before the Mollen Commission bespeaks considerable good faith and specifies some concrete steps to attempt to eliminate the very practices that plaintiff has targeted in this lawsuit.

Second, I could take judicial notice of Commissioner Kelly's date of appointment, which was October 16, 1992 (*see* Sylvia Moreno, *A 29 Year Vet is Named New Commissioner,* NEWSDAY, Oct. 17, 1992), and that date alone strongly suggests the lack of any meaningful connection between Kelly and the policies that he subsequently disavowed before the Mollen Commission. The Commission began its field inquiries in July 1993, and its report observed that the Department had showed little interest in uncovering corruption until that time. But, given the timing of Kelly's ascension to the position of Commissioner, the suggestion that he bore some responsibility for the earlier policy or for its apparent effects on the way in which the supervisors of the 90th Precinct handled the problems of plaintiff is tenuous indeed.

■ In sum, I am simply not prepared to draw the requested inference on such a paucity of concrete evidence. Accordingly, I conclude that plaintiff has failed to demonstrate the legal responsibility of former Commissioner Kelly for the constitutional violations that she suffered.

## C. Assessing the Legal Responsibility of the City

■ The remaining defendant is the City of New York. Since *Monell v. New York City Dep't of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), it has been accepted that a municipality may be held liable under section 1983 for those of its policies that cause constitutional violations. *See, e.g., McMillian v. Monroe County,* —— U.S. ——, ——, 117 S.Ct. 1734, 1736, 138 L.Ed.2d 1 (1997). Such policies will be attributed to the municipality if authored by an official charged with authority to make final decisions in that area. *See, e.g., City of St. Louis v. Praprotnik,* 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988). The court must "identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." *McMillian,* —— U.S. at ——, 117 S.Ct. at 1736 (quoting *Jett v. Dallas Independent School Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 2724, 105 L.Ed.2d 598 (1989)).

■ There is no meaningful dispute in the current record that the Commissioners of the Police Department are policymakers for purposes of binding the City. There is also no question that a binding policy may be inferred from "a series of decisions by a subordinate official [that] manifested a 'custom or usage' of which the supervisor must have

been aware." *Praprotnik,* 485 U.S. at 130, 108 S.Ct. at 928. In such a case, "the supervisor could realistically be deemed to have adopted a policy that happened to have been formulated or initiated by a lower-ranking official." *Id. Accord, e.g., Commissioners of Bryan County v. Brown,* —— U.S. ——, ——, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997)(citing *Monell,* 436 U.S. at 690–91, 98 S.Ct. at 2036) (referring to "relevant practice [that] is so widespread as to have the force of law").

I view the record in this case as establishing an unwritten Department policy, consistent with these parameters, that sanctioned a "custom or usage" by lower level officials and officers (1) to discourage reporting of corrupt acts by police officers and (2) to retaliate against officers who did bring such misconduct to the attention of Department authorities. In this respect I place principal reliance on the unrebutted factual findings of the Mollen Commission to the effect that since at least the early or mid–1980s, Police Department Commissioners and their subordinates have made clear their desire to minimize disclosure of corrupt acts and practices within the Department and have tolerated, over an extended period of time, an unmistakable pattern under which officers were taught, from the outset of their tenure with the Department, that they should not "rat" on their colleagues and that failure to follow this advice would expose them to serious retribution.[17] As also described in the Report, officers who chose to defy the accepted rule were in fact targeted for retaliation.

These findings, both in their description of the pervasiveness of these practices and in their attribution of complicity to a series of

Commissioners, adequately demonstrate that this pattern is attributable to a policy or custom of the Department's decisionmakers. This suffices to expose the City to liability for the foreseeable consequences of the policy or custom.

I must next determine whether the policy or custom identified by the Mollen Commission was the causal factor in bringing about such constitutional injury as plaintiff suffered. *See generally Gentile,* 926 F.2d at 152–53. I again view the evidence as sufficient to establish that link.

The misconduct established by plaintiff commenced in 1988 and continued, albeit with some lessening in intensity, until as late as 1994. This time frame corresponds roughly with the time period addressed by the Mollen Commission Report. Indeed, the Report cites a specific instance in 1986 when the then-Commissioner most explicitly articulated the strongly held view that disclosure of corruption within the Department was undesirable and should be discouraged. The account provided by the Commission makes clear that this approach was a standard part of life in the Department in the 1980s and into the early part of the 1990s. Indeed, the Commission notes that senior managers of the Department made little or no effort on their own to ferret out such corruption until the Commission commenced its own inquiries in mid–1993.

Given this timing, the events recounted by plaintiff fit well within the time frame of the Departmental policy or custom identified by the Commission.[18] Moreover, I note that the specific misconduct recounted by plaintiff

17. We note that plaintiff testified that she was told by the IAD to report misconduct while she was at NSU 14. We view the Mollen Commission Report in this respect as probably reflecting the common experience of new recruits at the Police Academy, and in fact plaintiff recounted that, while she was at the Academy, no instruction was offered on how to deal with observed instances of police misconduct. She also mentioned an incident at the Academy involving apparent misconduct by two cadets which led to comments by an instructor to the effect that such misbehavior should not be brought to the attention of the authorities or the public.

18. Although some of the acts continued into 1993 and, to a degree, 1994, we view that as entirely unsurprising. Given the degree to which supervisors and subordinates in the Department had internalized long-accepted notions of behavior in dealing with an officer viewed as a "rat", even an official change of policy by the new head of the Department in 1993—an assumption that we indulge on the basis of the Mollen Commission Report and the testimony of former Commissioner Kelly—can hardly be expected to change long-ingrained habits. We thus view acts that might be said to postdate a change in official Department policy as the inevitable product of the earlier policy.

**392**

bears a striking resemblance to the general descriptions offered by the Mollen Commission Report. As noted, the Report alluded to efforts to isolate the targeted officer, including refusals to assist the officer, threats of harm and apparently occasional vandalism. (Report at 53–55). These very acts and other similar ones were the subject not only of plaintiff's trial testimony, but also of her original complaints within the Department and her first and second pleadings in this case, all of which predated the Mollen Commission Report.

 In sum, I am well satisfied that plaintiff has met her burden to establish that the demonstrated violations of her rights were the product of a Department policy or custom.[19] The City is therefore liable for those violations.

### D. Impact of the City's Limitations Defense

 Before assessing what remedies may be available to plaintiff, I must address the impact of defendants' invocation of a time-bar defense. The applicable statute of limitations for claims under section 1983 is three years in New York. See, e.g., Owens v. Okure, 488 U.S. 235, 249–50, 109 S.Ct. 573, 581, 102 L.Ed.2d 594 (1989); Ormiston v. Nelson, 117 F.3d 69, 71 (2d Cir.1997); Cornwell v. Robinson, 23 F.3d 694, 703 (2d Cir. 1994). Thus, unless subjected to some form of tolling or other exception, the time limit would preclude the assertion by plaintiff of claims for conduct engaged in prior to October 1990. This would exclude recovery for some of the most egregious misconduct, which, as noted, took place in 1988 and 1989.

Ultimately I conclude that the City may not invoke the time bar in the manner that it seeks.[20] This follows from our conclusions that plaintiff has been subjected to a series of constitutional torts by various members of the Department starting in 1988, and that those wrongs were committed in conformity with a custom or practice that was in effect in the Department since at least the mid–1980s.

 As a general matter, a claim accrues under section 1983 "'when the plaintiff knows or has reason to know of the injury which is the basis of his action.'" Ormiston, 117 F.3d at 71 (quoting Singleton v. City of New York, 632 F.2d 185, 191 (2d Cir.1980), cert. denied, 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 347 (1981)). If, however, the plaintiff is exposed to "a 'continuous practice and policy of discrimination, ... the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.'" Cornwell, 23 F.3d at 703 (quoting Gomes v. Avco Corp., 964 F.2d 1330, 1333 (2d Cir.1992)).[21]

 The "continuing violation" exception to the ordinary rule of accrual has been recognized not only in discrimination cases, but also more generally in suits under section 1983 for retaliatory or discriminatory conduct. See, e.g., id. at 704; Gros v. Port Washington Police Dist., 944 F.Supp. 1072, 1083 (E.D.N.Y.1996); Wise, 928 F.Supp. at 366. It applies when "there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as

**19.** In its post-trial brief, the City argues against Monell-type liability principally on the basis that plaintiff has not demonstrated any Department policy against conducting investigations of her complaints. As is evident from our analysis, this argument seriously misstates the nature of the policy or custom at issue in this case. The fact that the Department undertook such inquiries at plaintiff's request does not preclude the conclusion that there was a custom within the Department to tolerate both the concealment of corrupt practices and active discouragement of such disclosures, including retaliation against officers who spoke out. Moreover, plaintiff's suggestion that the investigations were inadequate is at least partly supported by the finding of the Mollen

Commission to the effect that the IAD and FIAU were left without sufficient resources or guidance.

**20.** The other defendants found liable had no involvement in any constitutional torts prior to 1991. Accordingly, their liability is not affected by the statute-of-limitations analysis.

**21.** The determination of when a claim accrues under section 1983 is governed by federal law. See, e.g., Ormiston, 117 F.3d at 71–72; Eagleston v. Guido, 41 F.3d 865, 870 (2d Cir.1994), cert. denied, —— U.S. ——, 116 S.Ct. 53, 133 L.Ed.2d 18 (1995).

to amount to a discriminatory policy or practice." *Cornwell,* 23 F.3d at 704; *see also Wise,* 928 F.Supp. at 366–67.

■ As I have observed, plaintiff suffered from a series of acts of retaliatory harassment by various Department personnel over a period of years. I have found that these individual acts were the product of a custom or policy within the Department that acquiesced in the pervasive practice of retaliating against officers who exposed acts of corruption by fellow officers. Given these findings, the individual torts, although varying in their details, constituted a continuing wrong, thus permitting plaintiff, by her 1993 lawsuit, to recover for misconduct occurring since 1988. *See, e.g, Cornwell,* 23 F.3d at 704.

E. *Amount and Apportionment of Damages*

There remains the question of what relief plaintiff may be entitled to from each of the defendants whom I have found liable for misconduct. I start with the City.

Plaintiff seeks compensatory damages for serious emotional distress that she asserts was occasioned by an unremitting campaign of threats, hostile acts and ostracism by her fellow officers and supervisors, and by the unabated refusal of the Department to take her complaints seriously. There is no question that plaintiff has suffered from serious stress during a substantial part of her career since her exposure of Officer Ward. Indeed, during one period of time in 1995 she was placed on limited duty for a number of months as a result of a stress-related disorder, and I am prepared to infer—even in the absence of psychiatric records—that this problem was related, at least in part, to the hostility that she encountered at the 90th Precinct.[22]

The difficulty that I face in determining an appropriate monetary figure is twofold.

First, there is an inherent imprecision in assigning a dollar figure to something as amorphous as psychological injury. Second, in this case it is necessary to differentiate between stress caused by the conduct that I have determined to have been wrongful and a variety of other factors that may have contributed to plaintiff's distress.

I start by noting that acts of overt and, in some cases, extreme hostility exhibited toward plaintiff early in her career at the 66th Precinct and then at the 90th Precinct almost inevitably had a very serious impact on a young and apparently enthusiastic new officer. She appears not to have been given much warning that her act of honesty could have such devastating consequences, since, by her testimony, she was instructed during training to report acts of misconduct and assured that she would be given confidentiality. The initial discovery that her identity had been immediately and widely disclosed, followed promptly by apparently serious acts of vandalism, threats and ostracism by her fellow officers at the 66th Precinct was, I infer, psychologically very destructive. Indeed, the seriousness of the events at that precinct is underscored by the advice that she received from the precinct commander to transfer because she was about to lose his protection. This comment and her willingness to comply indicate the perilous and undoubtedly lonely position in which she found herself there. Under the circumstances, significant stress was inevitable.

I infer that the situation became still more difficult for her on her appearance at the 90th Precinct. First, this was intended as a refuge from the harassment that she had encountered at the prior precinct, and yet she immediately discovered that her reputation had followed her to her new workplace and, perhaps even more troubling, that the commander of this precinct not only was not protective of her, but in fact promptly com-

---

22. I note that in proving damages for a claim under section 1983, plaintiff must only provide some evidence of the magnitude of her injury, *see, e.g., Davis v. Village Park II Realty Co.,* 578 F.2d 461, 463 (2d Cir.1978); *Binder v. Long Island Lighting Co.,* 847 F.Supp. 1007, 1027 (E.D.N.Y.1994), and not "objective evidence of

severe emotional injury" as with claims under the Federal Employers' Liability Act. *See, e.g., Metro–North Commuter R.R. Co. v. Buckley,* —— U.S. ——, —— – ——, 117 S.Ct. 2113, 2124–25, 138 L.Ed.2d 560 (1997). Plaintiff has provided sufficient evidence of emotional distress for me to assess her damages.

municated to her his disdain for her and for what she had done.

This sign of lack of support from the precinct command was apparently quickly followed by a series of incidents indicating that plaintiff was going to encounter overt hostility at her new precinct equivalent to what she had met at the first precinct. As noted, the interference with her radio unquestionably added to her sense of vulnerability on the streets, an exacerbation of what would otherwise be an unavoidable professional hazard. Similarly, I view her receipt of the anonymously mailed copy of the Ward memorandum as also significantly disconcerting, since it suggested again that routine safety procedures were to be disregarded in her case.

I also view the manner in which the Department handled its investigations of these incidents as adding to plaintiff's feeling of insecurity. I note that the investigators never identified any of the wrongdoers or, of course, took any action against them, and never informed plaintiff of the outcome of their efforts. This uncertainty undoubtedly contributed to plaintiff's sense of lack of support and vulnerability within the precinct.

Apart from these specific incidents, the longer-term refusal of fellow officers to work with plaintiff and the evident failure of the precinct command to deal with this situation certainly added further to the routine and daily pressures that are presumably a normal part of a police officer's duties. Moreover, the absence of any effective remedial path for these problems again appears likely to have been a fertile source of psychological distress.

Over time I observe a pattern in which plaintiff became increasingly discouraged and thus ventured only on an occasional basis to seek help from the Department, and those occasional forays appear to have been uniformly futile. This too seems likely to have contributed to a deterioration of plaintiff's state of mind.

Having noted these sources of long-term stress in the actions of defendants that unquestionably violated plaintiff's First Amendment rights, I must take into account various other sources of strain that cannot fairly be attributed to defendants' misconduct. In the 1990s plaintiff has plainly suffered from a variety of personal difficulties. Notably, she witnessed the collapse of her marriage and the attendant difficulties of raising two children on her own, including particularly problems in arranging for appropriate child care. In addition she apparently suffered from some health problems, which contributed to her frequent absences from work. Indeed, in one instance she was involved in a serious traffic accident that apparently left her in some pain, and led to her filing a lawsuit against the other driver.

Related to these difficulties, plaintiff experienced the frustration of being unable to obtain assignment to the Community Policing Program, which she apparently viewed as particularly attractive for purposes of meeting her family responsibilities. For reasons already explained, these difficulties are not attributable to any misconduct by defendants, but they all unquestionably contributed substantially to the emotional distress suffered by plaintiff during the period at issue.

In a similar vein, I note that plaintiff appears to have been genuinely aggrieved at the pattern of her post assignments over a period of years. This too undoubtedly contributed to her state of mind in the early 1990s, and yet, as previously observed, I am unable to find that those assignments reflected any retaliatory animus. Thus, again, to the extent that plaintiff's distress was occasioned by her unhappiness with her postings and her assumption that they were motivated by hostility to her, I cannot order her compensated.

Having conducted this *tour d'horizon*, I am still left with the task of converting compensable stress into a dollar figure. In doing so I must acknowledge the degree of arbitrariness that this exercise unavoidably entails. In this case that imprecision is compounded by the fact that plaintiff never sought professional help to deal with her undoubted psychological problems even though such assistance was recommended by the Department. Although she testified that she could not afford the expense of such treatment, I ques-

tion whether such help was financially unavailable.[23]

■ Our best judgment is that the bulk of the stress that is attributable to misconduct by defendants was suffered during the period from February 1988 until April 1994, when the precinct graffiti was erased.[24] Nonetheless, some of the injury was presumably suffered subsequently. I therefore assess damages for a period ending in February 1995.[25] Although the stresses varied from year to year, they may be assessed in the rough amount of $15,000 per year from February 1988 through February 1992, and $10,000 per year from February 1992 through February 1995. *See, e.g., Probst v. Reno,* 917 F.Supp. 554, 561–62 (N.D.Ill.1995). This yields a total of $90,000.00 in compensatory damages against the City for the entire range of emotional distress suffered by plaintiff from all of the wrongful conduct by police personnel, both known and unknown.

I still must assess damages against Inspector Girimonte and Sergeant McDermott. For reasons noted, I view Girimonte as culpable to a degree based on his failure to fulfill his responsibilities as the Commander of the precinct to correct a situation of which he plainly had notice. He did not assume command at the 90th Precinct until November 1991, and thus had responsibility only for the last three and one-half years of the relevant period. Moreover, as noted, the bulk of the most egregious misconduct occurred before that time. Again, although our apportionment of plaintiff's compensable injuries to this defendant requires some degree of arbitrariness, I conclude that he should be deemed liable for $10,000.00 of plaintiff's total losses, with his liability deemed to be joint and several with that of the City to the extent of that sum.

As for Sergeant McDermott, I have still less information since he did not testify. Thus I am limited to the information provided by plaintiff, which chiefly consisted of her account of how the sergeant gave short shrift to her complaint about her reassignments on the basis that she was a "rat."[26] Although I infer that this expression reflects a mindset that was prepared to tolerate much of the ostracism of plaintiff to which she testified, I nonetheless have no information as to the length of Sergeant McDermott's tenure at the precinct, much less the degree to which he may have been personally responsible in some meaningful way for plaintiff's plight when he was there. Given these limitations, I conclude that Sergeant McDermott's liability should be limited to $5,000.00, for which he is to be jointly and severally liable with the City.

## CONCLUSION

For the reasons stated, I conclude that plaintiff has established that certain of the defendants violated her First Amendment right to report police corruption, and that

---

**23.** Defendants have not argued that plaintiff failed to mitigate her damages, and accordingly we do not view plaintiff's failure to seek treatment as a basis for diminishing the damages to which she would otherwise be entitled. *See, e.g., Dailey v. Societe Generale,* 108 F.3d 451, 456 (2d Cir.1997); *Meyers v. City of Cincinnati,* 14 F.3d 1115, 1119 (6th Cir.1994).

**24.** We recognize that the cutoff of April 1994 is somewhat arbitrary since we assume that attitudes engendered by the graffiti and other practices did not disappear in a day. Nonetheless, given the absence of any persuasive evidence of any further incidents or wrongful conduct beyond this time period and the somewhat speculative nature of the entire exercise, we believe that this approach is justified and that any effort at greater precision would be entirely illusory.

**25.** In adopting this method, I note that plaintiff undoubtedly suffered some tort-induced stress after April 1994, even though the proven miscon-

duct has not been shown to have continued beyond that point. Plaintiff is entitled to be compensated for all pain or suffering caused by the proven misconduct, even if the injury is ongoing well beyond the period of wrongdoing. Nonetheless, the further in time we move away from the period of misdeeds, the more likely it is that the stress that plaintiff continues to suffer from is increasingly the product of factors other than retaliatory actions by the defendants. I have taken these concerns into consideration in fashioning relief, and I believe that the total awarded to plaintiff will adequately compensate her for all stress that she has suffered or is likely to suffer from the misconduct that she has proven.

**26.** As we have observed, Officer Ariza reported having engaged in a similar conversation with Sergeant McDermott.

they did so by a pattern of retaliation that continued from early 1988 until at least the spring of 1994. I further conclude that plaintiff has established that she suffered emotional distress as a consequence of those violations, and that judgment should therefore be entered in her favor and against the City of New York in the amount of $90,-000.00, and that defendants Albert Girimonte and James McDermott shall be held liable to plaintiff, jointly and severally with the City, in the respective amounts of $10,000.00 and $5,000.00. The complaint will be dismissed against the other defendants.

Pursuant to 42 U.S.C. § 1988, plaintiff's counsel may apply for an award of attorney's fees within thirty days.